UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
ARCH SPECIALTY INSURANCE COMPANY,   )
                                    )
              Plaintiff,            )
                                    )
         v.                         )       CIVIL ACTION
                                    )       NO. 19-12570-WGY
COLONY INSURANCE COMPANY, and       )
ENDURANCE AMERICAN SPECIALTY        )
INSURANCE COMPANY,                  )
                                    )
              Defendant.            )
_____)
```

YOUNG, D.J.                                    March 14, 2021


**MEMORANDUM & ORDER**


**I.    INTRODUCTION**

Arch Specialty Insurance Company ("Arch") seeks declaratory
judgment establishing that Endurance American Specialty
Insurance Company ("Endurance") must share its duty to defend
one of its clients, the Board of Governors of Glover Landing
Condominium Trust ("Glover Landing"), against a lawsuit.  See
Pl.'s Third Am. Compl. ("Arch's Third Am. Compl."), ¶¶ 23-49,
ECF No. 30.  The Board of Governors has been sued by two
Condominium owners, Nicholas Mango ("Mango") and Elizabeth
Garthe ("Garthe"), in Housing Court.  Id.  Mango and Garthe
allege that the Board of Governors' failure to make necessary
repairs and the bungling of construction projects they

1

undertook, among other things, has forced them to vacate their apartment.  <u>See</u> Statement Material Facts Mot. Dismiss Arch Against Colony, Ex. 1, Mango Housing Compl. ("Underlying Complaint") ¶¶ 94-141, ECF No. 43-1.  Both Arch and Endurance moved for summary judgment seeking declaratory judgment on: (1) whether Endurance shares a duty to defend with Arch; and (2) if so, how the duty is to be allocated.  <u>See</u> Pl.'s Mot. Summ. J. Endurance ("Arch's Mot. Summ. J. Against Endurance"), ECF No. 44; Mot. Summ. J. Endurance ("Endurance's Cross-Mot. Summ. J."), ECF No. 54.

At the hearing on October 18, 2021, the Court took the matter of Endurance's duty to defend -- and thus both Arch's motion and Endurance's cross-motion -- under advisement.  <u>See</u> Electronic Clerk's Notes, ECF No. 69.

This Court DENIES Arch's motion for summary judgment and GRANTS Endurance's cross-motion for summary judgment.

**A.   Procedural History**

Arch[1] filed its first complaint on December 23, 2019, against four defendants: Colony Insurance Company ("Colony"), Nova Casualty Company, Endurance, and Greenwich Insurance

---

[1] In its first complaint Arch filed under the name Arch Insurance company.  <u>See</u> Pl.'s Compl. ("Arch's Compl."), ECF No. 1.  It later amended its complaint to reflect the name Arch Specialty Insurance Company.  <u>See</u> Pl.'s Second Am. Compl. ("Arch's Second Am. Compl."), ECF No. 12.

Company (collectively, the "Defendant Companies").  Pl.'s Compl.

("Arch's Compl."), ECF No. 1.[2]

Arch brought five counts in its complaint.  See Arch's

Third Am. Compl. ¶¶ 23-49.[3]  The first four counts are identical

and seek declaratory judgment compelling each of the respective

Defendant Companies to defend Grover Landing Condominium Trust's

Board of Governors against a lawsuit filed by one of its tenants

(the "Underlying Suit").  Id.  In these counts Arch also seeks

declaratory judgment establishing that each Defendant Company

---

[2] Arch moved to amend its complaint several times.  Pursuant
to Federal Rule of Civil Procedure 15, Arch amended its
complaint on January 24, 2020, as a matter of course solely to
correct the name of one of the defendants "Colony Specialty
Insurance Company" to "Colony Insurance Company."  Pl.'s Am.
Compl. 1, ECF No. 6.  Arch moved to amend its complaint twice
more -- the Court granted both motions.  See Mot. Leave File
Second Am. Compl., ECF No. 9; Electronic Order, ECF No. 11; Mot.
Leave File Third Am. Compl., ECF No. 28; Electronic Order, ECF
No. 29.  Arch's second amended complaint only changed the
plaintiff's name from "Arch Insurance Company" to the present
plaintiff "Arch Specialty Insurance Company," Arch's Second Am.
Compl., and its third updated the name of the defendant
"Endurance American Insurance Company" to "Endurance American
Specialty Insurance Company," Arch's Third Am. Compl.

[3] This Court has diversity jurisdiction over this matter
pursuant to 28 U.S.C. § 1332.  Arch is an insurance company
registered with the Massachusetts Division of insurance, it is
incorporated in Missouri, and its principal place of business is
in Jersey City, New Jersey.  Pl.'s Suppl. Corporate Disclosure,
ECF No. 64; Arch's Third Am. Compl. ¶ 1.  Endurance is an
insurance company registered with the Massachusetts Division of
Insurance with its principal place of business in Purchase, New
York and is incorporated in Delaware.  See Endurance Corporate
Disclosure Information, ECF No. 68.

must contribute to Arch's existing defense and clarifying the appropriate method of cost allocation among Arch and the Defendant Companies.  Id.  The fifth count seeks an order compelling the Defendant Companies to "contribute ratably toward the payment of defense costs incurred in the underlying action, in amounts to be determined at trial" and to "[d]eclare the appropriate method of allocation of defense costs among the plaintiffs and defendants."  Id. ¶ 49.

On September 7, 2021, Arch voluntarily dropped two of the counts, Counts III and IV, effectively dismissing its case against two of the defendant companies: Nova Casualty Company and Greenwich Insurance Company.  See Notice Voluntary Dismissal, ECF No. 60.

All three of the remaining parties then moved for summary judgment.  Arch moved for partial summary judgment against Colony and Endurance on the issue of their duty to defend and how that duty is to be allocated.  See Pl.'s Mot. Summ. J. Colony, ECF No. 41; Arch's Mot. Summ. J. Against Endurance. Colony and Endurance cross-moved for summary judgment against Arch, seeking dismissal of the claims against them and declaratory judgment establishing that they had no duty to

defend or contribute to the Underlying Suit.  See Mot. Colony

Summ. J.[4], ECF No. 48; Endurance's Cross-Mot. Summ. J.[5]

During the hearing on October 18, 2021, this Court granted

Colony's cross-motion for summary judgment and denied Arch's

partial motion for summary judgment against Colony (Count I),

Arch's Third Am. Compl. ¶¶ 23-27, holding that Colony had no

duty to defend, because a coverage exclusion contained in its

insurance contract with Grover Landing applied, see Electronic

Clerk's Notes, ECF No. 69.  The Court took the matter of

Endurance's duty to defend (Count III), Third Am. Compl. ¶¶ 33-

37, under advisement, see Electronic Clerk's Notes.

The parties have fully briefed this issue.  See Pl. Arch

Specialty Insurance Co.'s Mem. Supp. Mot. Partial Summ. J.

Endurance's Duty Defend ("Arch's Mem. Summ. J. Against

Endurance"), ECF No. 45; Mem. Endurance Supp. Opp'n Pl.'s Mot.

Partial Summ. J. & Cross-Mot. Summ. J. ("Endurance's Mem. Summ.

J.") 6-13, ECF No. 55; Arch's Opp'n Mem. Endurance Mot. Summ. J.

& Reply Endurance's Opp'n Mot. Summ. J. ("Arch's Opp'n

---

[4] Colony's Motion for Summary Judgment was not designated as a cross-motion, but it was filed subsequent to Arch's Motion. See Arch's Mot. Summ. J.; Colony's Cross-Mot. Summ. J.

[5] Colony had also previously filed a counterclaim seeking declaratory relief absolving it of any duty to defend or contribute.  See Answer Am. Compl. Countercl. Colony Insurance Co., ECF No. 34.

Endurance"), ECF No. 62; Reply Endurance Supp. Cross. Mot. Summ. J. ("Endurance's Reply"), ECF No. 67.

### B.   Undisputed Facts

#### 1.   The Underlying Complaint

Mango and Garthe have owned a condominium, Unit 7B, located in Building 21 at Glover Landing in Marblehead, Massachusetts ("Unit 7B"), since 1982.  See Underlying Complaint ¶ 1.[6]  They resided in this condominium until February 6, 2015, at which point they allege the apartment became uninhabitable and they were forced to vacate.  See id.  Mango and Garthe filed suit in the Northeast Housing Court for the Commonwealth of Massachusetts on December 17, 2015 (the "Underlying Suit"), against Timothy Brenton, Michael O'Connor, Lawrence Garrett, Susan Hankins, Rebecca Magoon, Grace Tucker, Lynne Celli, Douglas Haley, and Christine Lenahan, individually and in their capacity as the Board of Governors of Glover Landing (the "Mango Defendants" or the "Board").  See generally id.

In the Underlying Suit, Mango and Garthe brought six counts against the Mango Defendants: (1) negligence; (2) intentional damage to real property; (3) trespass; (4) a derivative action

---

[6] The same document is also reproduced by Endurance.  See Def. Endurance Rule 56.1 Statement Undisputed Fact Supp. Opp'n Pl.'s Partial Mot. Summ. J. & Cross-Mot. Summ. J., Ex. 1, Pl.'s Third Am. Compl. & Housing Compl., No. ECF 56-1.

for breach of fiduciary duties; (5) violation of civil rights (based Mango and Garthe's inability to use and enjoy their property); and (6) a request for injunctive relief (blocking the Mango defendants from replacing the windows in Unit 7B with non-code-compliant windows).  See Underlying Complaint ¶¶ 94-141. These counts mostly revolve around the Board's failure to approve replacements for faulty windows in Unit 7B and the Board's failure to repair the roof, which allegedly leaked into Unit 7B, damaging the ceiling, walls, and floors of the apartment.  Id. ¶¶ 59-84, 93.  The complaint (the "Underlying Complaint"), however, also makes allegations regarding the condition of the fire escapes, id. ¶¶ 37-53, the balconies, id. ¶¶ 54-58, the foundation, and other structural deficiencies, id. ¶ 85.

The events that caused damage to Unit 7B are drawn in part from the Underlying Complaint.

### 2.   Sources of Extrinsic Facts

In addition to the Underlying Complaint there are several other relevant sources of information: two of Mango's depositions, several letters, and a deposition from Daniel Darisse ("Darisse"), the Property Manager for Grover Landing, among other exhibits.  See Def. Endurance Rule 56.1 Statement Undisputed Fact Supp. Opp'n Pl.'s Partial Mot. Summ. J. & Cross-Mot. Summ. J. ("Endurance's Facts") ¶¶ 7, 13-20, 38, 42-43, ECF

7

No. 56.  While the parties disagree as to the materiality of these documents and depositions, they do not deny their veracity or authenticity.  See, e.g., Arch's Resp. Endurance's Rule 56.1 Statement Facts ("Arch's Facts") ¶ 7, ECF No. 61; Arch's Opp'n Endurance 2-6; Endurance's Reply 3-6.

The events that caused damage to the Garthe's unit are also drawn in part from these extrinsic facts -- the materiality of which will be discussed later in this Memorandum and Order, see infra II.B.1.c.

### 3.   The Events Causing Damage

The extrinsic facts bear on several general allegations regarding the state of disrepair of Grover Landing.  In his depositions, Mango alleges that Grover Landing was built before permits were issued in 1967, making it not code-compliant. Endurance's Facts, Ex. 2, Tr. Nicholas Mango Deposition Vol. 2 ("Mango Dep. I") 235:23-237:10, ECF No. 56-2.  Mango testified that the buildings that constitute Grover Landing also never received the required inspections.  Id. 237:20-23.[7]  Allegedly, the Board has kept this secret from its tenants for over 50 years.  Id. 246:1-3.  According to Mango, the original bungled construction is the source of many (if not all) of the problems,

---

[7] Mango stated that out of 400 required inspections, Glover Landing only received ten, resulting in a set of "blatantly unsafe" buildings.  Mango Dep. I 237:20-23.

including the "messed up" roof drains, cracks in the walls, and the architecture of the windows.  Id. 246:4-6, 248:4-6.  The negligence of the Board in making repairs and replacements, however, compounded these problems, Mango testified.  Id. 247:19-248:10.

Arch's dispute with Endurance revolves around a limited set of issues, which can be grouped into three general problems: (a) the window dispute, (b) the upper and lower roof leaks, and (c) general hurdles with obtaining repairs.  See generally Arch's Third Am. Compl.; Arch's Mem. Summ. J. Against Endurance; Endurance's Mem. Summ. J.

### a. The Window Dispute

The Underlying Complaint alleges that in 1988 Grover Landing amended the Master Deed to remove windows from the common elements; as a matter of policy, however, Glover Landing continued to repair, maintain, and replace windows in individual condominiums.  Underlying Complaint ¶¶ 59-60.  It was not until 1997 that Grover Landing began holding individual unit owners responsible for the maintenance of their windows.  Id. ¶ 63.  Both prior to and after 1988, the windows were failing, causing rain and storm leakage.  Id. ¶ 62.

In his depositions, Mango testified that when he was elected to the Board in 1991, he discovered that the unit windows were not code-compliant and were improper for an

oceanfront property like Grover Landing.  Mango Dep. I 258:3-24, 260:1-261:23.  Mango sought to fix the problem, but the Board refused his proposal, which prompted him to leave the Board in 1992.  Id. 262:1-24; Endurance's Facts, Ex. 3, Nicholas Mango Dep. ("Mango Dep. II") 69:9-15, ECF No. 56-3.

The Underlying Complaint alleges that by the early 2000s the windows were in "deplorable condition."  Underlying Complaint ¶ 64.  At this time, Mango testified, the Board had a change of heart regarding replacing the windows.  Mango Dep. II 72:1-14, 124:1-7, 125:1-22.  In fact, in February 2005 the Board issued notices stating that, as of April 1, 2005, no unit could be sold unless all of its original windows had been replaced and stating that Pella Windows was an approved manufacturer. Endurance's Facts, Ex. 4, Window Replacement Notices, ECF No. 56-4.  Glover Landing arranged for this replacement deal with Pella, but individual unit owners were still responsible for buying in.  Id.  Glover Landing took this step because "[m]any of the original wood frame windows [were] rotting along with the frames," causing damage to the units.  Id.

Mango did not buy into the plan and replace his windows at this time.  Endurance's Facts, Ex. 5, Letter from Irving Weisman, ECF No. 56-5.  The windows inside Unit 7B continued to deteriorate; in fact, on April 17, 2007, Irving Weisman, Mango's downstairs neighbor, complained to the Board that flooding was

entering through the Mango's window and affecting his unit.  Id.
The Board fixed at least some of Unit 7B's windows at that time
at Glover Landing's expense.  Endurance's Facts, Ex. 6, Nicholas
Mango 2007 Letter, ECF No. 56-6.

On May 3, 2007, Mango wrote a letter to the Board
complaining that other windows -- beyond those already replaced
-- in Unit 7B were leaking and asking the Board to replace them.
Id.  Mango, Garthe, and the Board exchanged several letters from
July 2007 to August 2007.  Endurance's Facts, Ex. 8, Mango &
Grover Landing Letters, ECF No. 56-8.  In short, Mango wanted to
replace Unit 7Bs remaining windows with windows from an
alternative manufacturer, citing the complex-wide problems with
the Pella windows.  Id.[8]

The Underlying Complaint alleges that in 2008 Mango had
four windows replaced in Unit 7B with the approval of the Board.
Underlying Complaint ¶ 65.  Mango and Garthe alleged that the
specifications the Board mandated for these windows caused them
to "deteriorat[e] due to thermal factors," structural defects in
the building, and the unsuitability of the windows for the

---

[8] There is extrinsic evidence to suggest that complex-wide
problems did in fact exist at this time.  On June 20, 2007,
another Glover Landing resident wrote the Board complaining
about window leaks; one of these leaks she claimed continued
even after she replaced her windows with the Pella windows the
Board recommended.  Endurance's Facts, Ex. 7, Barbara Smith
Letter, ECF No. 56-7.

building.  Id. ¶¶ 66-68.  Mango and Garthe later became aware that these windows were also not code-compliant.  Id. ¶ 68.[9]

In 2014, Mango and Garthe tried again to replace windows in Unit 7B,[10] but the only plan the Board would approve was non-code-compliant.  Id. ¶¶ 19-21.  Mango and Garthe brought this to the Board's attention both in writing and at in-person meetings. Id. ¶ 21.  They later attempted to replace the windows at their own expense, engaging the services of a construction company; they submitted the company's report and proposal to the Board on August 18, 2014.  Id. ¶¶ 22-27.

On September 3, 2014, Mango and Garthe met with the Board to discuss the construction company's report and several code violations in the building; the Board agreed to fix these

---

[9] The Underlying Complaint states that at some point "thereafter [2008]" Mango and Garthe "became aware that the windows routinely recommended and approved by [the Board] did not meet the requirements of the Massachusetts State Building Code as to structural requirements and child safety fall prevention."  Underlying Compl. ¶ 68.  The Court disregards this statement, to the extent it contradicts Mango's statement at deposition, that he and the Board were aware of the window's non-code compliance from 1991 onward.  See Martinez v. Caico Ins. Co., 851 F. Supp. 2d 336, 375 n.10 (D.P.R. 2011) (refusing to consider facts in an affidavit that were contradicted by Plaintiff's own deposition testimony at the summary judgment stage).

[10] It is disputed whether the windows Garthe and Mango sought to replace at this time were windows that were never replaced in 2008, or whether this was Mango and Garthe's attempt to remedy the windows they installed in 2008, which they claimed began to deteriorate soon thereafter.  See Arch's Resps. Endurance's Rule 56.1 Statement Facts ¶ 25, ECF No. 61.

issues, including the windows, but never granted the Plaintiffs approval for code-compliant windows.  Id. ¶ 28.  In July 2014 Mango and Garthe submitted yet another proposal for code-compliant windows, which the Board rejected.  Id. ¶ 29.  On September 22, 2015, Mango and Garthe, through counsel, served the Board with a demand letter detailing the alleged deficiencies at Grover Landing, drawing attention to the "longstanding" issue with the windows.  See Endurance's Facts ¶ 29; id. Ex. 35, Demand Letter 6-7, ECF No. 56-35.  Mango and Garthe made several other attempts to coordinate with the Board and obtain approval to install code-compliant windows including in February 2015 and November 2015, but the Board refused to cooperate.  Underlying Complaint ¶ 29.

After Mango and Garthe left On February 19, 2015, the Board retained the engineering company CCA LLC ("CCA").  See Endurance's Facts, Ex. 16, CCA Inspection 1, ECF No. 56-16.  CCA reported that the water leaks likely originated from the third-floor window of Unit 7B and spread due to the poor condition of the window frame and trim; CCA reported the conditions pertaining to the window leak "appear to have been present a long time."  Id.

Mango and Garthe allege that the failure to repair these windows contributed to the leaking and interior damage in their apartment.  Underlying Complaint ¶¶ 94-101 (Counts I and II).

### b. The Upper and Lower Roof Leaks

Mango and Garthe's complaints regarding damage within Unit 7B also rest in large part on persistent roof leaks they claim to have experienced.  In his depositions, Mango states that the roof leaks were caused in part by water collecting in a pipe that goes through Grover Landing's seawall and often freezes solid.  Mango Dep. II 50:9-14.  The roof redesign in 1998, Mango testified, exacerbated the problems with this pipe by collecting all the water from the two upper roofs into one pipe drain, which would leak into the attic of his unit, and by repatching the upper roof over Unit 7B, "devastat[ing]" his attic.  Id. 50:15-60:1, 60:10-20.  Mango stated that, at the time, he spoke with Darisse, the Property Manager, and Michael O'Connor ("O'Connor"), the Chairman of the Board, to express that the project was "ill-advised," but that no remedial action was taken.  Mango Dep. II 62:21, 64:7-10.  The 1998 redesign also included several spikes in Unit 7B's attic to sustain the roof redesign, which aggravated the leaking problems.  Id. 62:18-64:19.

In the Underlying Complaint Mango and Garthe claim that the Board of Governors had the **lower roof** adjacent to Unit 7B replaced at some point between 2000 and 2005.  Underlying Complaint ¶ 71.  A roofing contractor hired by the Board of Governors replaced the lower roof with a rubber roof and changed

the slope of the roof.  Id. ¶¶ 73-75.  The installation of the new roof was allegedly completed without a permit or inspection. Id.  Mango and Garthe claim that the lower roof was poorly designed, constructed, and installed and caused several leaks in the building, including inside Unit 7B, through the lower roof's membrane.  Id. ¶ 78.

The Underlying Complaint also alleges that sometime between 2000 and 2005, under the Board's supervision, the Glover Landing in-house maintenance staff changed the drainage system which serves **both the upper and lower roof**.  Id. ¶¶ 72-77.  This was also completed without a permit.  Id. ¶¶ 73-75.  As a consequence, the **upper roof** began to leak and has allegedly, "at all times material hereto up to and including the present suffered from water leaks that have caused water to penetrate into Unit 7B causing damage to the ceiling, walls and floors." Id. ¶ 83.

The Underlying Complaint alleges that problems with Glover Landing's **roof and roof drain** caused "significant flooding occurrences in 2007, 2011 and 2014."  Id. ¶ 79.  In an affidavit, Mango specified that a leak occurred February 13, 2014, even though there was no precipitation.  Endurance's Facts, Ex. 14, Aff. Nicholas K. Mango ("Mango Aff.") ¶ 14, ECF No. 56-14.  The Underlying Complaint further alleges that on February 5, 2015, a winter thaw caused another serious and

damaging leak from the **lower roof** into Unit 7B.  Underlying

Complaint ¶ 81.  Mango and Garthe vacated Unit 7B on February 6,

2015, due to it "becoming uninhabitable."  Id. ¶ 1.  Garthe

testified at deposition she had no knowledge of any major leaks

since.  Endurance Facts, Ex. 15, Tr. Dep. Elizabeth Garthe

("Garthe Dep.") 51:18-24, ECF No. 56-15.  Mango has suggested at

deposition that all of these floods were the same in nature and

caused by the same problem.  Mango Dep. I 361:1-24, 388:1-24.

The Underlying Complaint alleges that after these flooding

events, Mango and Garthe consistently requested that the Board

of Governors repair the roof and drainage system to no avail.

Underlying Complaint ¶¶ 79-80.

The extrinsic facts support this allegation.  In

particular, at deposition, Darisse, the Property Manager,

discussed how he was aware of the **lower roof leaks happening in

2011** and that Mango and Garthe had been emailing with the Board

(on November 30, 2011) to discuss **roof leaks**.  Endurance Facts,

Ex. 12, Tr. Dep. Danny Darisse ("Darisse Dep.") 191:2-192:24,

ECF No. 56-12.  The **lower roof leaks** were at least in some

instances caused by melting snow, which would leak through Unit

7B's window and ceiling -- Darisse and Mango have suggested that

the 2011 and 2014 leaks were due to this reason.  Id. 192:18-

193:24; Mango Dep. I 388:7-11.  Darisse testified that snow

accumulating on the lower roof had caused **lower roof leaks**

16

taking place many times from 2002 to the present.  Darisse Dep. 193:14-196:18.  Furthermore, Darisse testified the **roof leaks** were in part caused by the drainpipe, which serves both the upper and lower roof, Underlying Complaint ¶ 72, freezing solid and maintenance having to thaw the pipe with a blowtorch -- something that also took place from 2002 to the present, Darisse Dep. 193:14-196:18.  As to the **upper roof** Darisse testified that he "at some point in time" assisted in testing the upper roof for water leaks because he was asked to by the Board of Health, presumably at Mango and Garthe's request.  Id. 190:1-18.  He also testified he had not been aware before then of the upper roof leaks.  Id.   Between February and June 2015 Mango and Garthe exchanged several communications with the Board about Unit 7B, and the Board inspected the unit on May 18, 2015.  Id. Ex. 17, February to June Written Communications, ECF No. 56-17.

Mango and Garthe claim that despite the Board's actual knowledge of problems occurring with both the lower and upper roof it took no action to resolve the issues and damage. Underlying Complaint ¶¶ 80, 82-84.

### c. Failure to Make Necessary Repairs

Mango and Garthe make allegations that cover "several years preceding the date of their complaint."  Id. ¶¶ 31-33.  During this time period, Mango and Garthe allege, the Board's in-house maintenance staff conducted various repairs, maintenance, and

renovations without building, plumbing, roofing, or electrical permits from the Town of Marblehead.  Id.

Among the unpermitted repairs that Mango and Garthe complain of is the Board's handling of the fire escape repairs. Id. ¶ 37.  Mango and Garthe claim that although they notified the Board of the problems with their fire escapes in August 2014, and inspectors told the Board to remedy the fire escapes' non-compliance in November 2015, the Board has yet to remedy the problems.  Id. ¶ 42.

Mango and Garthe also enumerate several problems with obtaining necessary "life and safety repairs" with regards to the balcony-railings.  Id. ¶ 30.  They claim the Board was made aware of a problem with their balcony railings in September 2013, and again reminded of this issue and August 2014, before the issue was resolved on May 18, 2015.  Id.

### d. Other Allegations

The Underlying Complaint alleges that commencing in 2014 the Board engaged in conduct intended to deprive Mango and Garthe of their property.  Id. ¶ 129.  It also alleges that the board engaged in threatening conduct, attempted to intimidate and extort, and attempted to coerce Mango and Garthe into violating Massachusetts law.  Id. ¶ 130.  Following the February 2015 flooding the Board engaged in actions to "obfuscate" the

lower roof flooding and allegedly entered Unit 7B without legal authority.  Id. ¶¶ 86-90.

On June 16, 2015, the Board sent a letter threatening to withhold a 6(d) certificate required for Mango and Garthe to sell Unit 7B unless they made certain repairs at their expense. Id. ¶¶ 88-90.

Mango and Garthe also seek emotional distress damages in their Underlying Complaint.  Id. ¶ 141.  Mango testified his emotional distress began in July 2014, Mango Dep. I 293:1-24, and Garthe testified hers began after she moved out of Unit 7B in 2015, but that she experienced some before, Garthe Dep. 17:19-24.

### 4.   The Insurance Policies

#### a.   Arch's Insurance Policy

Arch issued a Commercial General Liability Policy No. AGL0O2003-01 to Glover Landing, covering the period from July 1, 2014, to July 1, 2015.  Colony's Mot. Summ. J., Ex. F, Arch Insurance Letter 1, ECF No. 48-7.  Arch's policy requires it to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Id. 1-2.

On December 19, 2017, Arch entered into a settlement with the Board whereby it agreed to be solely responsible for its defense in the Underlying Action and the Board's "representation

without a reservation of rights."  Endurance's Facts ¶ 72; id.
Ex. 27, December 19 Agreement, ECF No. 56-27; Arch's Facts ¶ 72;
Underlying Complaint ¶¶ 2, 21.  Arch alleges it has spent
$800,000 in defense costs at the time it filed this action.  See
Arch's Third Am. Compl. ¶ 22.

### b.  Endurance's Insurance Policy

Endurance insured Glover Landing under two commercial
general liability policies, numbered CBC10001280800 and
CBC20000572400: the first from October 1, 2012 through July 1,
2013 ("2012-2013 Policy"), and the second from July 1, 2015
through July 1, 2016 ("2015-2016 Policy") -- both of which are
nearly identical.  See Arch's Facts, Ex. C, Endurance Insurance
Policy 2012-2013 ("Endurance 2012 Insurance Policy"), ECF No.
46-3; id. Ex. D Endurance Insurance Policy 2015-2016 ("Endurance
2015 Insurance Policy"), ECF. No 46-4.

The two policies are identical in the following respects.
In relevant part they promise to:

> [P]ay those sums that the insured becomes legally
> obligated to pay as damages because of "bodily injury"
> or "property damage" to which this insurance applies.
> [Endurance] will have the right and duty to defend the
> insured against seeking those damages.  However,
> [Endurance] will have no duty to defend the insured
> against any "suit" seeking damages for "bodily injury
> or property damage" to which this insurance does not
> apply.

<u>See</u> Endurance 2012 Insurance Policy 10[11]; Endurance 2015 Policy 14.  The policies only apply to property damage or bodily injury if it "is caused by 'an occurrence' that takes place in the 'coverage territory'; . . . occurs during the policy period"; and no authorized employee knew of the property damage "in whole or in part" prior to the policy period.  <u>See</u> Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14.

"'Bodily injury' or 'property damage' [is] deemed to have been known to have occurred at the earliest time when any insured . . . . [r]eceives a written or verbal demand . . . or [b]ecomes aware by any other means that 'bodily injury' or 'property damage' has occurred or begun to occur."  <u>See</u> Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14.

The policies include coverage exclusions for "[injuries that are] expected or intended from the standpoint of the injured."  <u>See</u> Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 15.  Endurance's policies also contain a coverage exclusion for professional liability:

> It is hereby agreed that this policy shall not apply to "bodily injury", "property damage" . . . or "medical expenses arising out of the rendering or failure to render any of the following professional services: [] Architect and Engineering Services, including preparing, approving or failure to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders or drawings and specifications.

---

[11] For ease of reference, the insurance policies are cited according to their page designation in CM-ECF.

> . . . It is further agreed that this policy shall not
> apply to "bodily injury", "property damage" . . . or
> medical expenses arising out of any supervisory,
> inspection, review or consultancy services performed
> in connection with any of the above professional
> services.

See Endurance 2012 Insurance Policy 30.  The 2015-2016 Policy

**only** added the following provision to the "Professional

Liability Exclusion":

> This exclusion applies even if the claims against any
> insured allege negligence or other wrongdoing in the
> supervision, hiring, employment, training or
> monitoring of others by that insured, if the
> "occurrence" which caused the "bodily injury" or
> "property damage", . . . involved the rendering of or
> failure to render any professional services by you or
> those who are either employed by you or performing
> work on your behalf in such capacity.

See Endurance 2015 Policy 35.  Arch seeks contribution from

Endurance on the costs of defending the Mango Defendants against

the Underlying Suit based on the aforementioned policies.  See

Arch's Third Am. Compl. ¶¶ 37, 49.

Endurance was first notified of the Underlying Suit on May

12, 2016, via a "General Notice of Occurrence or Claim."

Endurance's Facts, Ex. 28, ACORD General Liability Notice

Occurrence/Claim, ECF No. 56-28.  In November 2017 Arch and

Mount Vernon, another insurer, entered into an agreement to

split defense fees.  Endurance's Facts ¶ 71; Arch's Facts ¶ 71.

Prior to this agreement Endurance reached out to Arch to see

whether it could "make a small contribution to make this go away

and get Endurance on the release." Endurance's Facts, Ex. 30,
Endurance Emails August 2016, ECF No. 56-30. In March 2017 a
settlement conference between Arch, Mount Vernon, and the Board
took place; Endurance was in attendance but did not partake in
the settlement. Endurance's Facts ¶ 76; Arch's Facts ¶ 76.
Arch did not contact Endurance for the next 16 months; on July
31, 2018, Arch served Endurance with a formal tender demand
letter concerning the Underlying Suit. Endurance's Facts ¶ 77;
Arch's Facts ¶ 77. Endurance responded on November 5, 2018,
stating that there was no coverage under the Endurance policies.
Endurance's Facts ¶ 80; Arch's Facts ¶ 80.

## II. ANALYSIS

The central question of Arch's motion and Endurance's
cross-motion for summary judgment is whether Endurance has a
duty to defend the Board or to contribute financially to Arch's
defense, and if so, how the duty should be allocated. See
Arch's Mot. Summ. J. Endurance; Endurance's Cross-Motion Summ.
J.

Whether Endurance has a duty to defend hinges on two
issues: (1) whether its insurance policy triggers a duty to
defend by covering the alleged damage; and (2) whether,
notwithstanding the duty to defend existing for the coverage
time period, the exclusions contained in its policies preclude
it from having to defend the Board. Essex Ins. Co. v.

BloomSouth Flooring Corp., 562 F.3d 399, 403 (1st Cir. 2009).
If Endurance has a duty to defend, this Court must also
determine how such a duty ought be apportioned between Endurance
and Arch.

Arch argues Endurance has a duty to defend because the
relevant events alleged in the Underlying Complaint fall under
its coverage and none of the policies' exclusions apply.  See
generally Arch's Mot. Summ. J. Endurance.  Endurance replies
that the events that would trigger coverage fall outside its
coverage -- either temporally or because the insured knew of the
damage before the coverage began -- and, furthermore, that
several exclusions apply, including (1) the expected or intended
damages exclusion and (2) the professional services exclusion.
See generally Endurance's Cross-Motion Summ. J.

This Memorandum and Order first considers the duty to
defend generally, including what types of evidence are relevant
to determining the duty to defend and what factors courts
consider in assigning the duty to defend.  Second, it assesses
whether the scope of Endurance's coverage triggers a duty to
defend.

Concluding that Endurance's coverage does not trigger a
duty to defend, it declines to consider the final factor of
interest -- whether any coverage exclusions preclude the duty to

defend from applying to Endurance -- as such an analysis would prove duplicative.

### A.   Legal Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment. Id. In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial. Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

"The [summary judgment pleading standard is] the same where, as here, both parties have moved for summary judgment." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002). The fact that both parties have moved for summary judgment on the same issues, "neither dilutes nor distorts" the summary judgment standard of review. See Hartford Fire Ins. Co. v. CNA Ins. Co., 633 F.3d 50, 53 (1st Cir. 2011). When courts are considering cross-motions for summary judgment, they must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)). "Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" Wells Real Estate Inv. Tr. II, Inc. v. Chardón/Hato Rey P'ship, 615 F.3d 45, 51 (1st Cir. 2010) (quoting Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)). The Court must "in each instance [determine] whether the moving party has met its burden under Rule 56." Dan

Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991) (Caffrey, J.).

**B.   The Duty to Defend Generally**

This Court begins by providing an overview of the duty to defend, including what evidence is relevant to determining the duty and how the duty is to be assessed.

**1.   Evidence Relevant to the Duty to Defend**

"An insurer's duty to defend is determined by examining (1) the insurance policy; (2) the facts alleged against the insured; and (3) facts known or readily knowable by the insurer." Metropolitan Prop. & Cas. Ins. Co. v. Devlin, 95 F. Supp. 3d 278, 281 (D. Mass. 2015) (Saris, J.).

**a.   The Insurance Policy**

The first type of evidence this Court must consider is the insurance policy: if the "policy coverage and its purpose" expressly exclude the claims in question "an insurer is relieved of its duty to defend and investigate." Clarendon Nat'l Ins. Co. v. Philadelphia Indem. Ins. Co., 954 F.3d 397, 405 (1st Cir. 2020) (internal citations and quotations omitted).  "Under Massachusetts law, [t]he proper interpretation of an insurance policy is a matter of law to be decided by a court, not a jury." U.S. Liab. Ins. Co. v. Benchmark Const. Serv., Inc., 797 F.3d 116, 119 (1st Cir. 2015); see also Vermont Mutual Ins. Co. v. Zamsky, 732 F.3d 37, 42 (1st Cir. 2013).  The words of the

relevant insurance contract are constructed "according to the
fair meaning of the language used, as applied to the subject
matter." Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st
Cir. 2009) (internal quotation marks omitted).  "Where the words
in the policy are not ambiguous, they must be construed in their
usual and ordinary sense.  Where ambiguity does exist, the
ambiguity is resolved in favor of the insured." Town of Saugus
v. Zurich Am. Ins. Co., 791 F. Supp. 2d 274, 280 (D. Mass. 2011)
(Bowler, M.J.) (internal citations and quotations omitted).

The insured bears the initial burden of showing that the
underlying suit falls within the policy. See National Union
Fire Ins. Co. v. West Lake Acad., 548 F.3d 8, 13 (1st Cir. 2008)
(citing Nascimento v. Preferred Mut. Ins. Co., 513 F.3d 273, 277
(1st Cir. 2008)).  "Given the possible existence of any legal or
factual basis for payment under a policy, an insurer's duty to
defend should be decided summarily in favor of the insured."
Bucci v. Essex Ins. Co., 393 F.3d 285, 292 (1st Cir. 2005)
(quotations omitted).

### b.   The Underlying Complaint

Second, the claims made in the Underlying Complaint are
instrumental in determining the duty to defend.  "In order for
the duty [to defend] to arise, the underlying complaint need
only show, through general allegations, a possibility that the
liability claim falls within the insurance coverage.  There is

28

no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." Billings v. Commerce Ins. Co., 458 Mass. 194, 200-01 (2010) (quoting Sterilite Corp. v. Cont'l Cas. Co., 17 Mass. App. Ct. 316, 319 (1983)).

The "comparison test" is essential to determining whether the claims in the underlying complaint trigger a duty to defend. See EMD Millipore Corp. v. HDI-Gerling Am. Ins. Co., 511 F. Supp. 3d 41, 47 (D. Mass. 2021) (Burroughs, J.), appeal dismissed, No. 21-1103, 2021 WL 3556778 (1st Cir. May 28, 2021); Barrett Paving Materials, Inc. v. Cont'l Ins. Co., 488 F.3d 59, 63 (1st Cir. 2007). The test requires comparing "the facts alleged in the underlying complaint with the insurance policy provisions." Essex, 562 F.3d at 403-04. "[I]f the allegations in the [] complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms . . . the insurer has a duty to defend." Mt. Airy Ins. Co. v. Greenbaum, 127 F.3d 15, 18-19 (1st Cir. 1997) (quotations omitted).

To "adumbrate a claim" means "to give a sketchy representation of; outline broadly, omitting details; . . . or to suggest, indicate or disclose partially and with a purposeful avoidance of precision." Global Naps v. Fed. Ins. Co., 336 F.3d 59, 61 n.2 (1st Cir. 2003) (internal quotation omitted). In

other words, "[u]nder this comparison test, the insurer has a duty to defend if the underlying complaint discloses a 'potential or a possibility' for liability within the policy's coverage." Bucci, 393 F.3d at 290.  The court asks "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Essex, 562 F.3d at 404 (internal citations and quotations omitted).

It is of no consequence to this inquiry whether the allegations of the underlying complaint have merit. Id.  "The obligation of an insurer to defend is not, and cannot be, determined by reference to the facts **proven** at trial.  Rather, the duty to defend is based on the facts alleged in the complaint and those facts which **are known by the insurer**." Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10-11 (1989) (emphasis added).

### c.   The Extrinsic Facts

Third, the duty to defend is also determined by the "facts known or readily knowable" by the insurer.  Metropolitan Prop. & Cas., 95 F. Supp. 3d at 281.

> [E]ven where the allegations in the complaint state or roughly sketch a claim covered by an insured's policy, no duty to defend and investigate arises if there is **undisputed, readily knowable, and publicly available information in court records** that demonstrates that the insurer has no duty to defend and if there is an undisputed extrinsic fact that takes the case outside the coverage and that will not be litigated at the trial of the underlying action.

Clarendon, 954 F.3d at 405 (internal citations and quotations omitted) (emphasis added).  The relevant extrinsic facts for this inquiry are those that "may aid in [an insurer's] interpretation of the allegations in the complaint."  Ferreira v. Chrysler Grp. LLC, 468 Mass. 336, 342, (2014).

"Massachusetts courts generally use extrinsic facts . . . to aid interpretation of the complaint, and not as independent factual predicates for a duty to defend."  Open Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 15 (1st Cir. 2002).  They have ruled that extrinsic facts can provide context, assisting the Court better to understand the claims made.  See Boston Symphony Orchestra, Inc., 406 Mass. at 15.  The existence of extrinsic facts, however, ought not be taken as carte blanche "to transform a skeletal claim in the underlying complaint into an allegation arguably covered by the liability policy."  Open Software Found. Inc., 307 F.3d at 16.

As a preliminary matter the parties disagree as to what types of evidence properly fall within the "extrinsic facts" category.  Endurance argues depositions and other exhibits it has collected ought be considered in contextualizing the claims made in the Underlying Complaint.  Endurance's Reply 6-7.  The proposed evidence includes several depositions and communications between the relevant players.  See Endurance's

31

Facts ¶¶ 7, 13-21, 26, 29, 40-81.  Arch retorts that this evidence is not the type of readily knowable or undisputed information that can be used.  See Arch's Opp'n Endurance 3. Endurance responds that Arch's contentions are contrary to longstanding state law.  Endurance's Reply 4.

There are two types of extrinsic evidence that can be used to demonstrate the duty to defend does not apply: (1) "undisputed, readily knowable, and publicly available information" in court records and (2) "undisputed extrinsic facts that take the case outside the coverage and that will not be litigated at trial of the underlying action."  Billings v. Commerce Ins. Co., 458 Mass. 194, 205 & n.8 (2010).

Several of the types of evidence to which Endurance cites, and this Court includes in its Undisputed Facts, see supra I.B.3., fall under the first category of extrinsic evidence. For example, a Massachusetts court has concluded that affidavits filed in an underlying action, Citation Ins. Co. v. Newman, 80 Mass. App. Ct. 143, 150(2011), deposition testimony, and answers to interrogatories -- even if contradictory to the Underlying Complaint, Cohne v. Navigators Specialty Ins. Co., 361 F. Supp. 3d 132, 142 (D. Mass. 2019); see also House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co., 705 F. Supp. 2d 102, 109 (D. Mass. 2010) (Gorton, J.) (concluding that although certain types of evidence like affidavits and depositions ought be "carefully

scrutinized for bias" they nevertheless have bearing on courts' summary judgment considerations in duty to defend cases), are all viable forms of extrinsic evidence.  The depositions and affidavits to which Endurance cites were prepared and submitted for the Underlying Suit.  See generally Mango Dep. I; Mango Dep. II; Darisse Dep.; Mango Aff.  In fact, it is undisputed that Arch provided Endurance with copies of several of the exhibits pertinent to the Underlying case, see Endurance Facts ¶ 79; Arch's Facts ¶ 79, and Endurance argues it cites to these same exhibits, see Endurance's Reply 4.  Finally, Arch never disputes the facts contained within these depositions and affidavits, it only contests their materiality.  See generally Arch's Facts. Even if Arch did dispute the truthfulness of these depositions, their content would still be helpful in understanding the bounds of Mango and Garthe's allegations.

Other evidence submitted by Endurance would be admissible even were it not in a court record in the Underlying Suit, as it falls under the Second Category of extrinsic evidence.  For example, the notices mailed by Grover Landing and the letters of complaint mailed to Grover Landing, even if not court records in the Underlying suit, are relevant to establishing when key facts took place -- their authenticity is undisputed.  See Window Replacement Notices; Letter from Irving Weisman; Demand Letter. These exhibits are being used solely to establish a timeline of

what falls within and outside these insurers' coverage, making clear facts that would be uncontested in the Underlying Suit, which centers around the Board's liability (not when key damage took place).  Furthermore, demand letters have been held to fall within this second category.  Cohne, 361 F. Supp. 3d at 142.

Therefore, this Court concludes that the evidence to which Endurance cites and that this Court utilizes in its undisputed facts is viable for aiding in the determination of Endurance's duty to defend.  Regardless, even without taking this information into account, the Court's conclusion would remain the same.

Arch makes three specific objections to the use of the deposition testimony and other extrinsic evidence cited by Endurance -- (1) some of the evidence post-dates when Endurance's duty to defend was triggered; (2) this evidence does not constitute "undisputed, readily knowable, and publicly available" facts; and (3) there has been no conclusive step in the underlying litigation to narrow the relevant allegations to exclude the possibility of coverage.  See Arch's Opp'n Endurance 3-4.

Arch's second objection has been extensively examined, as this Court concludes the evidence upon which Endurance relies comports with the types of evidence both federal and state courts look to in determining duty to defend issues.

Furthermore, Arch fails to dispute the exhibits' content in this action.  Moreover, to the extent Arch argues it does so in the Underlying Action, it is irrelevant here; the exhibits' relevance to this action -- clarifying the bounds of Mango and Garthe's claims and establishing a timeline of events -- is entirely distinct from their usefulness in the Underlying Suit -- establishing the Board's liability.

Arch's first and third objections imply that there is a temporal window which applies to limit the "known or readily knowable" information the Court can consider.  This is not so.  First, Arch has not established that Endurance's duty to defend was **ever** triggered; whether it was is the subject of this memorandum.[12]  Therefore, Arch's argument that only evidence from before this trigger date can be used is unpersuasive.  Second, Arch conflates the question of **when an insurer may withdraw his defenses** after some coverage has been established -- when the insurer "establishes that the potentially covered claims will not in fact fall within the insurance coverage," Conway Chevrolet Buick, Inc. v. Travelers Indem. Co., 136 F.3d 210,

---

[12]  To the extent that Arch is making the argument that Endurance had a duty to defend until some declaratory action absolved it of such duty, that is true **only insofar** as Endurance is found to have such a duty.  The responsibility to contribute to the duty to defend can exist even if a party has disclaimed the duty to defend and the Underlying Suit has gone to judgment if that duty has been triggered.  See Metro. Prop. & Cas. Ins. Co. v. Morrison, 460 Mass. 352, 359-61 (2011).

213-14 (1st Cir. 1998) -- with **a temporal rule limiting** what types of information can be considered as readily knowable, <u>see</u> Arch's Opp'n Endurance 4.  Actually, an insurer can use the information derived in discovery in the underlying action to absolve itself of the duty to defend.  <u>Sterilite Corp.</u> v. <u>Cont'l Cas. Co.</u>, 17 Mass. App. Ct. 316, 323 (1983) ("[T]he demonstration of the precise basis on which the third-party action will proceed may be made by discovery or other tactics within the third-party action, whose defense will have been undertaken by the insurer" and can be used to show absence of a duty to defend); <u>Lumbermens Mut. Cas. Co.</u> v. <u>Belleville Indus., Inc.</u>, 407 Mass. 675, 686 (1990) ("[B]ut it is apparent from the event that gave rise to the underlying claim that the loss is not covered by the insurance policy.").  Furthermore, if the duty to defend is disproved on this basis, the insurer is relieved of that duty entirely -- provided the underlying claim or complaint are not amended -- contrary to Arch's contentions. <u>Lumbermens</u>, 407 Mass. at 686.

### 2.    The Duty to Defend Test

Establishing whether a duty to defend exists generally involves working through two stages.  At the first stage, "[t]he insured initially bears the burden of showing that the allegations in the underlying complaint fit within the covered risks in the policy." <u>Essex</u>, 562 F.3d at 404.  Second, "[o]nce

36

the insured has satisfied this burden, it falls to the insurer to prove the applicability of one or more separate and distinct exclusionary provisions" to avoid the duty to defend.  Id. (quotations omitted).  If the insured succeeds and the insurer fails at either of these steps, then the duty to defend is established.  Id.

This Court proceeds to the first step of the duty to defend test, asking whether the Board's behavior was covered by Endurance's policies' scope of coverage.

## C.   The Scope of Coverage

Arch argues that the Underlying claims fall within Endurance's 2012-2013 and 2015-2016 Policies because the 2008 window installation "failed sometime prior to 2014" and because Mango and Garthe allege that their upper roof leaked at "all time material hereto."  Arch's Mem. Summ. J. Against Endurance 6-7.  Furthermore, Arch claims that "to the extent there are uncertainties in the dates or other aspects of the broad allegations, such uncertainties must be resolved in favor of the insured and Endurance's duty to defend."  Id. 7.

In rebuttal, Endurance argues that the Underlying Complaint does not establish a duty to defend because: (1) it does not state any damage was "triggered" during Endurance's policy period since much of the damage to Unit 7B occurred before Endurance's 2012-2013 policy kicked in; (2) any damage that

37

occurred during Endurance's 2012-2013 and 2015-2016 policies was a continuation of existing damage and thus exempted by the "known loss" provision of its policies; and (3) Arch cannot rely on undated allegations to remedy these deficiencies. Endurance's Mem. Summ. J. 6-13.

In order to answer these questions, this Court must look to Endurance's Policy and the underlying events buttressing the complaint.

In determining whether specific behaviors are covered by an insurer's policy, courts look at "the source from which the plaintiff's personal injury originates" in the plaintiff's underlying litigation, "rather than [looking to] specific theories of liability alleged in the complaint." Scottsdale Ins. Co. v. Byrne, 913 F.3d 221, 228 (1st Cir. 2019) (quotation omitted).  These are compared to the policies whose terms are given their ordinary meaning and interpreted as a reasonable insured individual would expect.  See Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 290-82 (1997). "Massachusetts applies the 'in for one, in for all' approach, meaning that 'where an insurer is obligated to defend an insured on one of the counts alleged against it, the insurer must defend the insured on all counts, including those that are not covered.'" Millipore, 511 F. Supp. 3d at 48 (quoting Mount

<u>Vernon Fire Ins. Co.</u> v. <u>Visionaid, Inc.</u>, 477 Mass. 343, 350-51 (2017)).

Endurance's policies trigger a duty to defend for "bodily injury" and "property damage" that is (a) "caused by an 'occurrence'" ("Occurrence Requirement"); (b) taking place "during the policy period" ("Taking Place Requirement"); and (c) "was not, prior to the policy period, known to have occurred by any insured listed . . . ." ("No Knowledge Requirement"). <u>See</u> Endurance Insurance Policy 1.

### a. The Occurrence Requirement

First, this Court must determine if the facts alleged in the Underlying Complaint constitute an "occurrence" within the meaning of each policy. Endurance's policies describe an "occurrence" as **"an accident**, including continuous and repeated exposure to substantially the same general harmful conditions." Endurance Insurance Policy 14 (emphasis added). Thus, this Court must determine whether the events complained of were "accident[s]," <u>id.</u>, within the meaning of the policy.

With respect to this issue Endurance argues that the Board acted intentionally and thus not accidentally, <u>see</u> Endurance's Reply 9, whereas Arch argues that at least one count sounds in negligence, which establishes their accidental nature, <u>see</u> Arch's Mem. Summ. J. Against Endurance. Considering the Underlying Complaint and undisputed facts, the majority of the

Board of Governor's actions appear to fall under the definition of "accident" and thus "occurrence" under Endurance's policy.

Generally, the term "accident" is construed broadly. Beacon Textiles Corp. v. Employers Mut. Liab. Ins. Co., 355 Mass. 643, 645 (1969). "In its common signification the word means an unexpected happening without intention or design." Id. at 646; see also Liberty Mut. Ins. Co. v. Tabor, 407 Mass. 354, 358, 553 N.E.2d 909 (1990); see also Smartfoods, Inc. v. Northbrook Property & Cas. Co., 35 Mass. App. Ct. 239, 242 (1993) (holding that accident "by definition, implies the unexpected"). An event can be an accident, even if its precise mechanics remain unknown. See Hanover Ins. Grp., Inc. v. Raw Seafoods, Inc., 91 Mass. App. Ct. 401, 406 (2017) (concluding that "[w]hile the precise cause or mechanics of the damage to the scallops is unknown" it was still a covered "occurrence" under the relevant policy).

Massachusetts courts have "consistently [] stated that the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured **does not specifically intend to cause the resulting harm or is not substantially** certain that such harm will occur." Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 84 (1984) (emphasis added). In other words, the key inquiry is whether the insured "intended or expected to

cause the injury in question"; if they did not, then the behavior is an "accident" and can fall under the definition of an occurrence.  Terra Nova Ins. Co. v. Fray-Witzer, 449 Mass. 406, 413 (2007).

Here, it is undisputed that at least some of the Board's actions are accidental and thus fall under the definition of "occurrences."  None of the allegations in the Underlying Complaint can be construed as suggesting that the Board intentionally shirked its duties and avoided repairs **in order to damage Unit 7B.**  See generally Underlying Complaint.  If anything, Mango and Garthe's depositions suggest different reasons for not wanting to conduct the repairs, such as the Board already having undertaken the repairs in question for their units at their own expense.  Mango Dep. I 262:22-24 ("And I think they wouldn't do it because of the governors had already replaced their windows, and they didn't want to [do] other unit owners['] too.").  Mango and Garthe's allegations -- that (1) contractors, under the Board's direction, erroneously changed the slope of the roof, increasing leaks in Unit 7B; (2) that the board knowingly approved inadequate windows; and (3) the Board failed to provide adequate repairs, Underlying Complaint ¶¶ 73, 69-70, 30, 37, 42 -- while perhaps indicative of knowing or negligent acts, **do not** establish that the Board **intended or expected** to **cause harm** to Mango and Garthe, or Unit 7B.  Even

41

though these acts are clearly volitional acts on behalf of the Board, this fact does not change that the intended or expected outcome was to make modifications to the apartment building, and not to damage Unit 7B or cause harm to Mango and Garthe. Therefore, Endurance has **failed** to establish that these key occurrences were **not** accidental.

### b.   The Taking Place Requirement

Second, this Court must determine whether the "property damage" alleged was "caused by an 'occurrence' that **t[ook] place** during the policy period." Endurance Insurance Policy 1 (emphasis added). Arch seeks summary judgment on the basis that the "broad allegations of the underlying complaint permit[] proof of property damage at any time" during the two Endurance policy periods. Arch's Mem. Summ. J. Against Endurance 9. Endurance rebuts that Arch has not met its burden of demonstrating that any occurrence or damage falls within Endurance's policy. Endurance's Reply 2. The policy language in question states that an event is covered if:

> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place during the policy period; [and]
> (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

See Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14. "Under 'occurrence' coverage, as commonly construed and applied in Massachusetts [law]. . . and other states as well, an

42

entity making a tort claim against the insured must sustain harm within the period of the policy in order to assert a claim to which the insurance applies." Hoppy's Oil Serv., Inc. v. Ins. Co. of N. Am., 783 F. Supp. 1505, 1508 (D. Mass. 1992) (Keeton, J.) (citing Robert E. Keeton & Alan I. Widiss, Insurance Law § 5.10(d)(1) (1988)).

"Courts have found determining when an 'occurrence' occurred, that is, **when the actual damage** took place, to be a vexed problem." Colonial Gas Co. v. Aetna Cas. & Sur. Co., 823 F. Supp. 975, 982 (D. Mass. 1993) (Woodlock, J.) (emphasis added). There are several approaches to defining when an "occurrence" occurs; these have been dubbed "triggers" by Massachusetts courts. See Trustees of Tufts Univ. v. Com. Union Ins. Co., 415 Mass. 844, 854 (1993). This session of this Court has acknowledged several possible theories for determining when an occurrence has taken place: (1) the "wrongful act theory" -- when the wrongful or negligent act took place; (2) the "exposure trigger" -- when claimant's property is tortiously exposed to the hazard or problem; (3) the "injury in fact" trigger -- when the events were sufficient to actually amount to damage, even if it was yet to be discovered; (4) the "manifestation" trigger -- when damage is "reasonably capable of . . . diagnosis"; (5) the "first discovery theory" -- "when the sovereigns actually discovered" the damage; (6) the "continuous" trigger theory --

each year from the first hazardous exposure.  See In re Acushnet River & New Bedford Harbor: Proc. Re Alleged PCB Pollution, 725 F. Supp. 1264, 1274 (D. Mass. 1989) (quoting Eagle-Picher Indus., Inc. v. Liberty Mutual Ins. Co., 682 F.2d 12, 25 (1st Cir. 1982), cert. denied, 460 U.S. 1028 (1983)); see also American Home Assurance Co. v. Libby-Owen-Ford Co., 786 F.2d 22, 30 (1st Cir. 1986) (adopting the fourth approach: "the test for determining the date of the occurrence should be the time at which a reasonable person would be aware that a defect exists that may give rise to a cause of action"); Trustees of Tufts Univ., 415 Mass. at 854 (discussing the sixth approach).

The Massachusetts Supreme Judicial Court "has refrained from electing a single trigger of coverage theory." Amtrol, Inc. v. Tudor Ins. Co., No. CIV.A.01-10461-DPW, 2002 WL 31194863, at *4 (D. Mass. Sept. 10, 2002) (Woodlock, J.). Instead, Massachusetts courts have opted for a holistic approach, concluding that different triggers are appropriate for different types of damage.  See Trustees of Tufts Univ., 415 Mass. at 855.  Although it has never been established outright, it appears that the most closely paired approach with negligent construction and property damage is the **manifestation approach.**[13]

---

[13] It ought be noted that this approach does not extend to cases dealing with property damage due to environmental contamination.  See Bos. Gas Co. v. Century Indem. Co., 454 Mass. 337, 350 (2009) (noting courts' rejection of this approach

See Cont'l Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 152

(1984) (concluding that an occurrence takes place not when a

wrongful act was committed, but rather when the complainant

experiences the damage, in a construction case); see also Trizec

Properties, Inc. v. Biltmore Constr. Co., 767 F.2d 810, 813

(11th Cir. 1985) (applying the manifestation approach in case

concerning negligence and breach of contract in construction

project). But see Amtrol, Inc. v. Tudor Ins. Co., No. 01-10461-

DPW, 2002 U.S. Dist. LEXIS 18691, at *16 (D. Mass. Sep. 10,

---

in environmental contamination cases); Peabody Essex Museum,
Inc. v. U.S. Fire Ins. Co., No. 06CV11209-NG, 2010 WL 3895172,
at **2, 12 (D. Mass. Sept. 30, 2010) (Gertner, J.) (holding
"injury-in-fact" to be the appropriate trigger in a case where
the policy required coverage for injury "caused by an
occurrence" and damages had been caused by an oil spill on a
Museum's property), aff'd, 802 F.3d 39 (1st Cir. 2015); Trustees
of Tufts Univ., 415 Mass. at 854 (holding the manifestation
approach to be inappropriate -- and explicitly not choosing a
trigger -- in a soil contamination case). Furthermore,
construction cases where the harm is exposure to toxic chemicals
also have strayed from the manifestation approach. Colonial Gas
Co. v. Aetna Cas. & Sur. Co., 823 F. Supp. 975, 977, 982-83 (D.
Mass. 1993) (adopting a wrongful act style approach -- the
"occurrence" takes place "upon installation" -- in a case where
the homeowners had a toxic type of insulation installed in their
home); see also, A.W. Chesterton Co. v. Northbrook Excess &
Surplus Ins. Co., No. 96-4871, 1999 Mass. Super. LEXIS 581, at
*65 (Sep. 29, 1999) (finding the manifestation approach to be
inappropriate in asbestos cases). These cases are clearly
distinguishable from cases like the case at bar, as the nature
of the damage and the way it affects the insured often remains
hidden for a long time after the negligent act takes place. See
Amtrol, Inc., 2002 WL 31194863, at *4 ("Unlike environmental
contamination which can take years before the property damage is
discovered, the leaks in question were easily discoverable,
causing whatever property damage to occur in short order.").

2002) (Woodlock, J.) (opting against any one trigger, as the leaks causing damage had all occurred "within short order"). For example, in Continental Cas. Co. v. Gilbane Building Co., the Massachusetts Supreme Judicial Court applied the manifestation approach, concluding that it was not when a Tower was completed, but when it malfunctioned, that determined the time of "occurrence." 391 Mass. 143, 152 (1984). Some courts dealing with construction issues and property damage also appear to de facto adopt a "manifestation" theory, even without stating it outright. See All Am. Ins. Co. v. Lampasona Concrete Corp., 95 Mass. App. Ct. 79, 83 (2019) (taking for granted that an "occurrence" had taken place during the coverage period because the damage was observable during the period, where a subcontractor's poor work had caused immediate damage). Finally, the First Circuit has noted that there is disagreement among this state's courts about when an occurrence takes place for "a latent defect or [] an emerging negative condition (like construction defects, leaking water heaters, peeling paint, or cracking floors)." American Home Assur. Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 813 (1st Cir. 2006). In its analysis, however, it acknowledged a trend towards the manifestation approach, stating that courts generally refuse to impose liability on the insurer at the time of the defect's origin. Id.

Applying this approach, it is possible that at least one occurrence of damage fell within Endurance's Policy periods; this conclusion encourages this Court to continue its inquiry to the third requirement of Endurance's Policy.

While true that the main instances of damage -- the 2007, 2011, 2014, and February 2015 roof leaks, see Underlying Complaint ¶¶ 79, 81 -- all occurred outside of the effective periods of Endurance's Policies, at least some instances of damage fall within the policy -- the upper roof leaking at all times from its repair in 2005 (at the latest) to the present, see id. ¶ 83.  While not a clear indication that certain events of damage fall within Endurance's policy, these allegations do establish that Mango and Garthe "state or adumbrate a claim" within Endurance's coverage period.  Mt. Airy Ins. Co., 127 F.3d at 18.  Given, Massachusetts' "in for one in for all approach," Millipore, 511 F. Supp. 3d at 48, this is enough to trigger Endurance's duty, if the third requirement of Endurance's policy is met.[14]  Before assessing whether the third coverage

---

[14] While this Court has applied the manifestation approach, given the support for its usage in comparable cases, the outcome above would be similar under any other of the six stated approaches.  The nature of this case creates two possible categories of "occurrences": (1) the making of faulty repairs or the failure to make repairs; and (2) the actual damages and leaks taking place within Unit 7B.  Here the "injury-in-fact" and the "first discovery" of each damaging event took place at the same time as the "manifestation" of the damage -- when the actual damages took place (category 2).  Therefore, following

47

requirement is met, however, this Court takes a moment to
address some of Arch's additional arguments on this point.

Specifically, this Court notes that it is not compelled by
Arch's argument that "[b]y implying that the windows installed
in 2008 deteriorated and failed at some point prior to 2014, the
Complaint states or adumbrates a claim covered by" Endurance's
2012-2013 Policy or that undated allegations should be taken as
establishing an occurrence within Endurance's coverage period.
See Arch's Mem. Summ. J. Against Endurance 7.  The First Circuit
has concluded that Courts cannot infer from an underlying
complaint's silence that certain undated events have taken place
within a policy period.  Clarendon, 954 F.3d at 406 ("[T]he fact
that the Underlying Complaint [did] not mention the precise

_____

the same rationale as that laid out above, there is a
possibility that at least some events took place within
Endurance's coverage period.  The "continuous" approach could
also rely on the continuous upper roof leaks to establish
coverage under Endurance's policy.  Finally, the "wrongful act"
and the "exposure" to the damaging condition likely took place
at the same time in this case -- when the faulty construction or
repairs took place (category 1).  There is much debate upon when
the original wrongful acts took place: at the building's
original construction in 1967, Mango Dep. I 235:23-237:10, the
roof replacement in 2000-2005, Underlying Complaint ¶ 71, or
some other originating event.  Arguably, however, Mango and
Garthe have alleged that a wrongful act took place every time
the Board was aware of new damages or leaks and did not
undertake the needed safety repairs.  Therefore, Mango and
Garthe's allegation that the Board had actual knowledge of all
of the upper roof leaks, id. ¶ 84, alongside their allegation
that the upper roof leaked at all times during the relevant
period, id. ¶ 83, would also establish possible coverage under
Endurance's Policy.

location, time, and repairs undertaken [was] insufficient to show that [the plaintiff's] claim possib[ly] . . . [fell] within the insurance coverage." (quotations omitted)); see also Glob. NAPs, Inc. v. Fed. Ins. Co., 336 F.3d 59, 66 (1st Cir. 2003) (emphasizing the notion that courts cannot read in coverage where none exists).  Arch attempts to manufacture an allegation where none exists here and fails to provide any extrinsic evidence in support of its claim that window damage or any other failed repairs occurred between 2012 and 2013; this prevents Arch from using this factual basis as an anchor for the duty to defend.

None of the other events in the Underlying Complaint fall within Endurance's 2012-2013 policy period, and Endurance's 2015-2016 policy period covers time after Mango and Garthe moved out of the Unit and thus would not cover any of the damage complained of.  See Underlying Complaint ¶ 1 (stating Mango and Garthe moved out in February 2015); Endurance 2015 Policy 2 (establishing coverage from July 2015 to July 2016).

Nevertheless, the upper roof leaks provide a sufficient basis for the duty to defend, and thus this Court moves to consider the third requirement for coverage.

### c.    The No Knowledge Requirement

The third requirement for Colony's and Endurance's policies to apply is the No Knowledge Requirement.  The relevant portion

of Endurance's policy mandates that the "insurance applies to 'bodily injury' and 'property damage' only if . . . [p]rior to the policy period, no insured . . . knew that the 'bodily injury' or 'property damage' had occurred in whole or in part." See Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14. The policy also provides that:

> If [] a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change, or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

See Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14. These two provisions will be collectively referred to as the No Knowledge Requirement.

Arch argues that Endurance cannot establish that all of the allegations constitute "known losses," because of the "broad allegations" of the Underlying Complaint. Arch Mem. Summ. J. Against Endurance 7-9. Endurance instead argues that (1) Arch "erroneously attempts to saddle Endurance with the burden of proving" that the losses were known, when it is in fact Arch's burden to prove a lack of knowledge; and (2) Endurance's Policy not only bars coverage for property damage that was known when the policies were issued, but also damage that was a "continuation, change, or resumption" of this known damage. Endurance's Mem. Summ. J. 7, 10. **The dispute regarding the No**

**Knowledge Requirement boils down to two questions**: (1) which party has the burden of establishing whether the loss was known?; and (2) is the damage that anchors Endurance's policy to the duty to defend a "continuation, change, or resumption" of damage that the Board was previously aware of?

With regard to the first issue the **burden of proof lies with Arch**.  Arch conflates the No Knowledge Requirement provision with the "known loss" doctrine, a creature of common law.  See Arch's Mem. Summ. J. Against Endurance 7 (arguing "Endurance cannot establish that all of the claims constitute known losses").  The No Knowledge Requirement admittedly codifies the "known loss" doctrine, which "precludes coverage when the insured knows in advance of the policy's effective date that a specific loss has already happened or is substantially certain to happen." United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 690 (1st Cir. 1995); John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F. Supp. 2d 77, 115 (D. Mass. 1999) (Bowler, M.J.) ("[W]here an insured knows of the loss in advance of the insurance policy's effective date, the doctrine precludes coverage.").  It is important to note, however, that this clause in an insurance contract does not necessarily function equivalently to the common law "known loss" doctrine.  See Selman, 70 F.3d at 690 (noting the two different "iterations" of the known loss doctrine -- at common law and in contract -- and

declining to consider contract-based iteration, as the insurers had waived the defense in the case at hand); see also John Beaudette, Inc., 94 F. Supp. 2d at 115 n.45 ("[Insurer] does not cite to the language in the policies . . . . Rather, it bases its known loss argument on the common law version of the doctrine."). The contract clause, prescribing No Knowledge in order for coverage to exist, is first and foremost a **requirement** for coverage according to a "fair meaning" of the contract and must be treated as such. See Torres, 561 F.3d at 77 (quotation marks omitted). Furthermore, Endurance bases its defense on the contract provision and not the common law version of the "known loss" doctrine. Endurance's Mem. Summ. J. 7-8. The fact that the "known loss" doctrine in this case is steeped in contract is of key importance.

At common law the burden of proof in establishing the "known loss" doctrine is on the **insurer**. See Selman, 70 F.3d at 691; see also John Beaudette, 94 F. Supp. 2d at 114 ("Under Massachusetts law, the known loss doctrine is an affirmative defense which the insurer bears the burden of establishing at trial."). Where, however, as here, "no knowledge" is a requirement for coverage **in contract,** and not a coverage exclusion, the burden of proof lies on the **insured,** or in this case the party arguing on its behalf, **Arch:**

> [A] plaintiff seeking to recover for breach of a duty
> or obligation created by a general clause of a
> contract, which also contains an exception
> descriptively limiting such duty or obligation, must
> allege and prove that his cause of action is within
> the contract and outside the exception; but . . .
> where the exception is in another separate and
> distinct clause of the contract defining the duty or
> obligation, then the burden is upon the party relying
> upon the exception.

Brown Daltas & Assocs., Inc. v. Gen. Acc. Ins. Co. of Am., 48

F.3d 30, 37 (1st Cir. 1995) (quotation marks omitted) (quoting

Ratner v. Canadian Universal Ins. Co., 359 Mass. 375, 380

(1971)) (applying this test in a case regarding a "discovery

clause" which only covered damage that the insured "first

bec[a]me aware of any circumstances which may subsequently give

rise to a claim").  This session of this Court later clarified

that "[w]here the exception" to coverage "is in the same general

clause" as the coverage requirements, "the burden is on the

plaintiff seeking to recover."  A & W Maint., Inc. v. First

Mercury Ins. Co., 91 F. Supp. 3d 113, 122 (D. Mass. 2015); cf.

City of Newton v. Krasnigor, 404 Mass. 682, 685-86 (1989)

(implicitly placing the burden on the insurer in a contract

which had a separate **exclusion** barring "expected or intended

injury"); cf. Highlands Ins. Co. v. Aerovox Inc., 424 Mass. 226,

231 (1997) (placing burden on insured to show exception to an

exclusion applied).  In fact, the First Circuit recently placed

the burden on the plaintiff seeking coverage to prove the

absence of known loss, in a case considering an almost identical insurance contract provision.  <u>See</u> <u>Clarendon</u>, 954 F.3d at 406. Arch incorrectly tries to limit this rule only to the duty to indemnify.  <u>See</u> <u>A & W Maint., Inc</u>, 91 F. Supp. 3d at 222 (adopting this rule generally to insurance contracts in a case dealing with both the duty to defend and indemnify).  Here the No Knowledge Requirement is one of the three main components that must exist in order for Endurance's coverage to apply -- it is contained in the same general clause as the other requirements.  <u>See</u> Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14.  The "known loss" doctrine here is in actuality a contractual requirement for coverage which must be established by the insured to demonstrate that the duty to defend exists. This flows from the notion that at the first step of the duty to defend test, **it is the insurer** who must show that coverage, and thus a duty, exists.  <u>Essex</u>, 562 F.3d at 403-04.  Regardless, as discussed further below, even if the burden did not lie on Arch, Endurance has adduced sufficient evidence that the Board did possess knowledge.

As to whether the No Knowledge Requirement is satisfied, Arch has not shown any evidence that the Board lacked knowledge of any possible occurrences taking place during Endurance's policy period.  Two parts of Endurance's policy are relevant to this issue: (a) its notice that coverage does not exist for any

"continuation, change, or resumption" of a known occurrence; (b)

its definition of what is considered to be "known":

> "Bodily injury" or "property damage" will be deemed to
> have been known to have occurred at the earliest time
> when any insured . . .
>> (1) Reports all, or any part, of the "bodily
>> injury" or "property damage" to us or any other
>> insurer;
>> (2) Receives a written or verbal demand or claim
>> for damages because of the "bodily injury" or
>> "property damage"; or
>> (3) Becomes aware by any other means that "bodily
>> injury" or "property damage" has occurred or has
>> begun to occur.

See Endurance 2012 Insurance Policy 10; Endurance 2015 Policy

14.  In construing the language "continuation, change, or

resumption," another session of this Court has concluded that

"[a]ttempts to remediate the damage, even temporarily successful

ones, do not transform the later continuation or recurrence of

**that very damage** into new instances of property damage that

would potentially be covered."  Clarendon Nat'l Ins. Co. v.

Phila. Indem. Ins. Co., No. CV 17-12541-LTS, 2019 WL 134614, at

*3 (D. Mass. Jan. 8, 2019) (Sorokin, J.)[15] (emphasis in

---

[15] Arch argues that this case is inapposite because the
court in Clarendon dealt with a situation in which the
"insured's knowledge was clearly spelled out in the underlying
complaint itself," whereas the present case "involves at least
two sets of windows and issues with both the upper and lower
roof."  Arch's Opp'n Endurance.  None of the varied allegations
regarding the windows, however, fall within Endurance's policy
period.  The only allegations that do, the upper roof leaks, are
heavily accompanied by Mango and Garthe's allegations that the
Board had actual knowledge of the roof leaks.  See Underlying
Complaint ¶ 84.

original), aff'd, 954 F.3d 397 (1st Cir. 2020); see also Town of
Saugus v. Zurich Am. Ins. Co., 791 F. Supp. 2d 274, 281 (D.
Mass. 2011) (holding where the insured was aware of something
the underlying suit's plaintiffs had "always maintained" the No
Knowledge Requirement had not been met).  Furthermore, where the
Underlying Complaint and extrinsic evidence make no suggestion
that a "new problem" arose "for the first time" during the
period, the Court ought find that the No Knowledge Requirement
has not been met and that the duty to defend does not exist.
Clarendon, 2019 WL 134614, at *3.

The definition of knowledge in Endurance's policy further
suggests that just "aware[ness]" of damage is sufficient to
destroy coverage.  See Endurance 2012 Insurance Policy 10;
Endurance 2015 Policy 14.  This is in line with the common law
standard, which requires "subjective knowledge."  Selman, 70
F.3d at 691.  Courts interpreting this standard have described
that "insurance is against an occurrence, not a reoccurrence . .
. [For example,] a homeowner could not insure his house against
flood damage when the rising waters were already in his front
yard."  Bartholomew v. Appalachian Ins. Co., 655 F.2d 27, 29
(1st Cir. 1981) (holding that insured had actual knowledge of
possible loss based on its own prior intentional misuse of
machine, which had already caused injury).  This contract
language, however, is even more limiting than the common law

56

"known loss" doctrine -- which has sometimes been read to require not just knowledge of possible claims, but of "probable or actual losses" via adjudications,  see, e.g., Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 449 Mass. 621, 637 (2007); SCA Servs., Inc. v. Transportation Ins. Co., 419 Mass. 528, 532-34 (1995) (insured had known loss where trial court declared a site to be a public nuisance and then insured was sued for personal injuries by townspeople affected by the very same site) -- as it covers **any** damage of which the insured was **aware**, see Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14.

Here, the rising water was already in the Board's proverbial front yard.  The case at bar is an extremely close parallel to the First Circuit's recent decision in Clarendon National Insurance Co. v. Philadelphia Indemnity Insurance Co. 954 F.3d 397 (1st Cir. 2020), involving a duty to defend suit between two insurers.  In Clarendon the Court interpreted known loss in its contract context; specifically, it applied an insurer's provision that prohibited coverage if damage was a "continuation, change, or resumption" of known damage.  Id. at 401.  The Clarendon court rejected the plaintiff's reliance on the varied use of the word "leak" and "leaks" in the underlying complaint to argue that the leaking complained of from the roof in the underlying complainant's unit was of a different nature

before versus during the coverage period -- thus, the court took the underlying defendants' awareness of the original leaks to bar coverage for future leaks from the roof.  Id. at 406.  The Court also rejected the argument that because repairs had taken place and the parties were not aware of when they took place any leaks happening after the repairs could be considered new and distinct damage.  Id.

Similarly, in the case before this Court there is one continuing type of damage, which is the only occurrence that appears to fall within Endurance's policy period -- the upper roof leaks into Unit 7B.  The Underlying Complaint alleges: (1) "[d]ue to significant flooding occurrences in 2007, 2011 and 2014, the Plaintiffs **repeatedly requested** that the Board cause the **roof and roof drain system** to be repaired or replaced to prevent further flooding"; (2) the upper roof leaked at all relevant times into Unit 7B; (3) "[d]espite the Governors actual knowledge of the upper roof leaks, the Governors have failed to resolve the ongoing upper roof leaks."  Underlying Complaint ¶¶ 79, 83, 84 (emphasis added).  This evidence alone is sufficient to suggest that the Board had knowledge of roof leaks from as early as 2007 and nonetheless allowed the roof leaks to continue or resume during the 2012-2013 Endurance Policy period.  Importantly, Mango and Garthe complain of the same type of damage -- the **upper roof leaking and damaging their ceiling,**

**walls, and floors** -- occurring to **them and Unit 7B** repeatedly from at least 2007 to the present.  Cf. Selman, 70 F.3d at 692 (concluding that knowledge of **possible** presence of lead paint in the building was not enough to constitute known loss in the common law context for individual's **later lead poisoning** and suit).

Arch opposes that the Board's knowledge of the lower roof leaks (in 2007, 2011, and 2014) cannot be extended to suggest that it was also aware of the upper roof leaks.  Arch's Mem. Summ. J. Endurance 8-9 Arch's Opp'n Endurance 7.  This counterargument fails for three reasons: (1) the roof drainage system which (in part) allegedly caused the upper roof leaks "serv[ed] [both] the lower roof and the upper roof,"; (2) when Mango and Garthe complained to the Board in 2007 and 2011 about the leaks in their apartment they allegedly mentioned both the roof (which could be read to mean the lower roof, but may also encompass the upper roof) and the roof drain which was clearly alleged in the Underlying Complaint to involve both the lower and the upper roof; and (3) Mango and Garthe alleged that the Board had "actual knowledge" the roof drain was deficient upon installation in 2000-2005, because it was installed without permits and thus risked being faulty.  Underlying Complaint ¶¶ 72, 79, 82.  It is also contradicted by Arch's own admission that the upper roof has been leaking since the alleged faulty

replacement in 2000-2005.  Arch's Mem. Summ. J. Against
Endurance 7.

Significantly, Arch nowhere alleges that the leaks in
question are new.  See generally Arch's Mem. Summ. J. Against
Endurance; Arch's Opp'n Endurance.  One of the cruxes of Arch's
rebuttal of the No Knowledge Requirement being met centers
around the installation of new windows, which they argue would
create the basis for a new damage unbeknownst to the Board.
Arch's Mem. Summ. J. Against Endurance 8-9.  Arch never alleges,
however, that the upper roof was repaired, and thus that any of
the leaking from the upper roof could be attributed to new
damage.  Likely this is because, as in Clarendon, "new distinct
leaks arising from different structural problems is inconsistent
with a reading of the Underlying Complaint as a whole."
Clarendon, 954 F.3d at 406.  The only evidence of any repairs
happening is actually introduced via Endurance's submission of
Darisse's deposition testimony, which states that at some point
in time he assisted in testing the upper roof for leaks.
Darisse Dep. 190:1-18.  Even if this evidence suggested that a
repair to the upper roof was made -- which it does not -- a
repair made at some unspecified time cannot be taken as evidence
of new damage, as it may simply suggest "continuation, change,
or resumption" of the same damage.  Clarendon, 954 F.3d at 406.
In summary, Arch provides no facts or argument to dispel the

notion that the Board had knowledge as early as 2007, or perhaps even 2000, of the upper roof leaks; instead, Endurance provides several pieces of evidence (based on the Underlying Complaint) that indicate the opposite -- that Mango and Garthe had for years flagged to the Board the leaking, since the inception of the upper roof's faulty construction.[16]

The extrinsic evidence, albeit not necessary, only buttresses the conclusion that the Board was aware of the damage caused by the roof before the inception of the first Endurance Policy in 2012.  As early as 1998 Mango expressed his concerns to Darisse and O'Connor, Chairman of the Board at the time, that the redesign of the upper and lower roofs could cause leaking within his Unit.  Mango Dep. II 62:21, 64:7-10.  The deposition testimony further suggests that the same pipe that caused upper roof leaking also cause lower roof leaking -- because it would freeze solid and would have to be blowtorched to thaw it.  Id. 50:9-14.  Darisse testified he had been aware of that pipe

---

[16] As a last-ditch attempt to persuade this Court, Arch cites to an interlocutory order in a companion case decided by the Suffolk Superior Court, as persuasive authority.  See Pl. Arch's Notice Supplemental Authority, ECF No. 70; see also Celli v. Greenwich Ins. Co., No. 2084CV00409-BLS1 (Mass. Super. Oct. 29, 2021) (Davis J.).  The Celli court's conclusion as to whether the **common law** known loss doctrine, imposing a different burden of proof, applies to a **different insurer**, Nova Casualty Insurance Company, however, has no bearing on the case before this Court.

freezing since 2002, indicating early knowledge of problems with the pipe that served the upper roof and of problems connected with the upper roof leaks.  Darisse Dep. 192:18-193:24.  On November 30, 2011, Garthe emailed the Board regarding "roof leaks."  Id. 191:1-24.  As Endurance's No Knowledge requirement includes any awareness of damage "in whole or in part," this further supports the notion that the Board had prior knowledge. See Endurance 2012 Insurance Policy 10; Endurance 2015 Policy 14.

## III. CONCLUSION

The Underlying Complaint alone suggests that the Board had prior knowledge of the upper roof leaks, the only damage that can be said to have taken place during Endurance's coverage period.  Therefore, Arch has not met its burden to establish that Endurance possesses a duty to defend.  Having so concluded, this Court need not proceed to the second step of the duty to defend test, or assess whether Endurance has successfully argued that certain coverage exclusions apply.  Furthermore, as the Court has determined no duty to defend exists, it need not address the proper method for allocating the duty to defend.

Accordingly, Arch's motion for summary judgment, ECF No. 44, is DENIED as to all claims and Endurance's cross-motion, ECF No. 54, is GRANTED.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[17]

---

[17] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 44 years.